UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CR 05 102ML

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) CR. NO. |
| v. | ) |
| | ) Violation of 18 U.S.C. §1343; |
| | ) 18 U.S.C. §§ 1956(a)(1)(A) (i) and 2. |
| JOHN E. CURRAN | ) |

# INDICTMENT

The Grand Jury charges that:

## COUNT 1
## (Wire Fraud)

### I. Introduction

At all times material to this Indictment:

#### A. The Defendant

1. Defendant, JOHN E. CURRAN, ("CURRAN") was a resident of Rhode Island.

2. From some time prior to in or about April, 1997, until in or about July, 2002, Rhode Island Health Aid, Inc. ("R.I. Health Aid") was an entity duly incorporated in the State of Rhode Island, doing business at 748 Reservoir Avenue, Cranston, Rhode Island. CURRAN was a principal in Rhode Island Health Aid.

3. The Northeastern Institute for Advanced Healing, Inc. ("Northeastern Institute") was, as of in or about July, 2002, the successor in name to R.I. Health Aid, and was duly incorporated in the State of Rhode Island with the purpose of engaging in "alternative health care". CURRAN was a principal in the Northeastern Institute, which had offices located at One Richmond Square, Suite 310-E, Providence, Rhode Island.

**B. The Practice of Medicine and Naturopathy**

4. Under Rhode Island General Laws § 5-37-1, a medical practitioner includes any person who holds himself or herself out as being able to diagnose, treat, operate or prescribe for any person ill or alleged to be ill with disease, pain, injury, deformity or abnormal physical or medical condition, or who either professes to heal, offer to undertake, by any means or method to diagnose, treat, operate or prescribe for any person for disease, pain, injury, deformity or physical or mental condition. In addition, pursuant to Rhode Island law, one who attaches the title "MD," or words or abbreviations to his name indicating that he or she is engaged in the treatment or diagnosis of diseases, injuries or conditions of persons is held to be engaged in the practice of medicine.

5. CURRAN was not a licensed medical practitioner or medical doctor.

6. The Unlicenced Health Care Practitioners Act, R.I. Gen. Laws §§ 23-74-1 et seq. (P.L. 2002, Ch. 133) (the "Act") applies to a broad domain of unlicenced healing methods and treatments including, but not limited to, detoxification practices and therapies, energetic healing, herbology and herbalism, polarity therapy, homeopathy, and naturopathy.

7. Naturopathy is an approach to treating disease and restoring health using natural therapies. It promotes prevention in health care and a non-invasive approach to treatment, including: acupuncture and oriental medicine, homeopathy, botanical medicine, nutritional counseling, mind-body medicine, hydrotherapy and physical medicine.

8. Naturopathic physicians ("NDs") attend a four-year graduate level naturopathic medical program and are educated in all of the same basic sciences as in conventional medical school. Studies concentrate on holistic and nontoxic approaches to therapy, prevention of

disease and optimizing wellness. Graduates sit for professional board exams to become licensed as naturopathic doctors within licensed states or as jurisdiction allows. CURRAN did not attend a four year naturopathic medical program.

9. Section 23-74-1(a)(4) of the Act defines an "unlicenced health care practitioner" as a person who: (1) is not licensed by a health-related licensing board or the Rhode Island director of health; (2) has not had a license issued by a health-related licensing board of the Rhode Island director of health revoked or suspended without reinstatement; (3) is engaged in unlicenced health care practices; and (4) is providing unlicenced health care services for remuneration or is holding oneself out to the public as a practitioner of unlicenced health care practices.

10. CURRAN was an unlicenced health care practitioner, as defined by R.I. Gen. Laws §23-74-1.

11. As an unlicenced health care practitioner, CURRAN was entitled to provide services only in accordance with governing laws and regulations.

12. Under R.I. Gen. Laws § 23-74-1(b), as an unlicenced health care practitioner, CURRAN could not provide a medical diagnosis nor could he practice medicine.

**C. <u>The United States Food and Drug Administration</u>**

13. The United States Food and Drug Administration ("FDA") was, and still is, a federal agency responsible for protecting the health and safety of the American public by ensuring, among other things, that American consumers are not harmed by the improper use of medical devices.

14. To support the functions of the FDA, Congress enacted the "Federal Food, Drug and Cosmetic Act," 21 U.S.C. §§ 301 et. seq., which legislation prohibits the use of certain devices

for purposes of diagnosing disease or other conditions.

15. Pursuant to 21 U.S.C. § 201(b) of the Federal Food, Drug and Cosmetics Act, the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is: (1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals; and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purpose.

16. As is further described below, Defendant JOHN CURRAN, utilized a NuLife Sciences Laboratory Grade Research Microscope in his practice to conduct what is referred to as a "live blood analysis." The NuLife Sciences Microscope was not cleared or approved by the FDA for use as a medical device.

17. Defendant, JOHN CURRAN, utilized a "BioMeridian Stress Assessment Device" in his practice. The BioMeridian Device (which is also referred to as the Meridian Stress Assessment) is referred to as a "galvanic device" and cleared by FDA as a Class II medical device for the measurement of the electrical resistance of the skin. No galvanic skin response devices, including the BioMeridian Stress Assessment Device, are cleared or approved by the FDA for the use in the diagnosis of disease.

**D. <u>The Clinical Laboratory Improvement Act of 1988</u>**

18. Pursuant to the Clinical Laboratory Improvement Act ("CLIA") of 1988, Federal certification was required for any facility testing samples "derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of human beings." 42 U.S.C. § 263a; 42 C.F.R. Part 493.

19. The performance of "live blood analysis" was governed by the CLIA because it was used for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or assessment, of the health of human beings.

20. On or about May 13, 1998, and June 18, 1998, CURRAN was specifically advised by the Rhode Island Department of Health (R.I.D.O.H.) that the performance of live blood analysis fell within the authority of CLIA and that he was required to submit a CLIA application to the Department of Health in order to be properly certified to perform live blood analysis.

21. On or about July 7, 1998, the United States Department of Health and Human Services ("H.H.S.") advised CURRAN that he had failed to submit a CLIA application to HHS and that if did not submit such an application, or a letter stating that he would no longer perform live blood analysis by July 16, 1998, H.H.S. would initiate adverse action against CURRAN.

22. On or about August 4, 1998, CURRAN responded to the R.I.D.O.H. by stating "I intend to comply with all the laws and regulations regarding live blood analysis, and will not conduct live blood analysis per request of the CLIA guidelines."

### E. Care Credit

23. "CareCredit" was a line of credit financed by GE Capital and utilized by medical practitioners for patients who were in need of a financial payment plan to receive services. CURRAN advised his clientele that they could apply for CareCredit in his office and receive immediate approval from the issuing company.

## II. The Scheme

24. During the period from 1997 through on or about December 31, 2004, in the District of Rhode Island, CURRAN knowingly and intentionally devised a scheme and artifice to defraud consumers seeking services from CURRAN and to obtain money from such consumers by means of false and fraudulent pretenses, representations and promises.

### A. Manner and Means

25. It was part of the scheme and artifice to defraud that CURRAN made misleading, false and fraudulent representations to the public, including alternative health care consumers, concerning his educational background, training and experience, in order to lead customers to believe that he was medical doctor, including the following:

a. CURRAN claimed to have received a medical degree ("MD") from St. Luke's School of Medicine located in Liberia, Africa. St. Luke's School of Medicine is an on-line, unaccredited program.

b. CURRAN represented that he had the following degrees from Chatworth College of Health Sciences: a bachelor of science degree ("B.S.") in nutrition; a doctoral degree in naturopathy ("N.D."); and a doctoral degree (Ph.D.) in nutritional science.

c. CURRAN held himself out in promotional materials as "Dr. John Curran, N.D.,

M.D.", "John E. Curran, N.D., M.D.", and "John E. Curran, N.M.D."'

d. CURRAN wore a name tag in his office referring to his various alleged credentials, and bearing the title "Dr.", "N.D." and "M.D."

26. It was further part of the scheme and artifice to defraud that on or about May 12, 2004, CURRAN forwarded a check in the amount of $2650 to Dr. Larry McDade for the purchase of a "Ph.D." degree. The check was forwarded in response to directions from Dr. Larry McDade, on behalf of the Chatworth College of Natural Health and Nutritional Science, to send him the money and to "type your full name as you wish to have it printed on the degree." CURRAN eventually received a Ph.D degree from the Chatworth College which was backdated to on or about January 10, 2000.

27. It was further part of the scheme and artifice to defraud that CURRAN falsely used a NuLife Sciences Laboratory Grade Research Microscope, with accompanying camera and microscopic slides, to perform "live blood analyses" to falsely and improperly diagnose disease and potential disease, contrary to federal and state regulations and contrary to his representation on August 4, 1998, to the R.I.D.O.H.,in which he represented that he would not conduct live blood analysis.

28. It was further part of the scheme and artifice to defraud that CURRAN falsely used a BioMeridian Stress Assessment Device to improperly diagnose disease and potential disease, contrary to federal regulations.

29. It was further part of the scheme and artifice to defraud that CURRAN provided written disclaimers to his customers that advised them that as a naturopath, he could not diagnose or treat disease. Defendant did so in writing, but not in his personal interactions with his patients

in order to insulate himself from charges that he was falsely practicing medicine.

30. It was further part of the scheme and artifice to defraud that CURRAN advertised his services. Despite the fact that CURRAN was not allowed by law to diagnose or treat patients and despite his written disclaimers, CURRAN, directed his advertisements, in part, to individuals who had "been diagnosed with a catastrophic disease or [were] facing its recurrence," and to those "looking for a **doctor** who's(sic) well-trained and knowledgeable in **medical** and natural health." (emphasis added).

31. It was further part of the scheme and artifice to defraud that, despite the fact that CURRAN was not allowed by law to diagnose or treat patients and despite his written disclaimers, CURRAN advertised "Physician Services Offered."

32. It was further part of the scheme and artifice to defraud that, despite the fact that CURRAN was not allowed by law to diagnose or treat patients and despite his written disclaimers, sometime prior to October 14, 2002, CURRAN caused the creation of a website identified as "www.drcurran.com" in which he advertised that he specialized in "Orthomolecular Medicine" and Naturopathic Medicine" and that he "Treats these health conditions: ADD . . . Artrithis, . . . Cancer, . . . Cerebral Palsey, . . . Epilepsy . . . Hearth-Cardiovascular Disease, . . . Infertility, . . . Multiple Sclerosis, . . . , Parasites, . . . Stroke, . . . Viral Infections."

33. It was further part of the scheme and artifice to defraud that, despite the fact that CURRAN was not allowed by law to diagnose or treat patients and despite his written disclaimers, on or about sometime prior to March 30, 2005, CURRAN caused the creation of a website identified as "www.alternativemedicine.com" in which he listed, among others, the following diagnostic services:

a. Lab tests for:

Early disease detection: HIV, Hepatitis C, Cholesterol, Diabetes, Kidney Disease, Thyroid (TSH), Allergy, Toxic Metal;

Cancer: Colon, or Prostate (PSA).

34. It was further part of the scheme and artifice to defraud that despite the fact that CURRAN was not allowed by law to diagnose or treat patients and despite his written disclaimers, CURRAN regularly asked customers what was described in his practice as "diagnostic sounding questions."

35. It was further part of the scheme and artifice to defraud that CURRAN established a practice with the trappings of a medical office in order to portray an environment that, in the words of his marketing plan, would "GET THEM IN THE DOOR! (w/o looking like a huxster)."

36. It was further part of the scheme and artifice to defraud that CURRAN falsely advised his customers that he had treated and cured patients of various serious conditions, including the following:

a. that he cured patients of cancer;

b. that he cured a woman whose uterus had dropped;

c. that he cured someone with hepatitis C; and

d. that he cured someone who had been in a wheelchair.

37. It was further part of the scheme and artifice to defraud that CURRAN subjected his customers to a live blood analysis and the bio-meridian stress assessment in order to falsely advise his customers, among other things that: (1) they had various abnormalities in their blood such as live parasites, severely reduced number of blood cells, worms, or "holes" in their blood;

(2) that they had certain deficient "body functions;" (3) that they had or would soon develop a life-threatening disease, such as cancer; and, (4) that he could cure them of a life-threatening disease, such as cancer.

38. It was further part of the scheme and artifice to defraud that, after falsely providing a customer with a diagnosis and fraudulent sales pitch, CURRAN induced his customers to purchase treatment programs and nutritional materials, the costs of which ranged from approximately $200.00 to $10,000.00.

39. It was further part of the scheme and artifice to defraud that, among, the materials CURRAN sold was what he referred to as "E-Water." According to his promotional materials, CURRAN, claimed that:

> each drop of this water will refresh your body and increase your vitality. Homeopathy has proven that water has remarkable memory and capacity to store energy. This specially energized water contains the same synergistic healing properties as the water in Lourdes, France, . . .
>
> * * *
>
> Body Balancing E-Water is uniquely charged water wherein the molecules spin in the reverse direction and emit electrical energy which your body's organs absorb to function at its optimal capacity. The elderly, adults, and children as well as animals and plants, can benefit dramatically from taking this E-Water. It is recommended for ALL ages.

In fact, the E-Water was essentially distilled water that CURRAN processed through a specialized blender.

40. It was further part of the scheme and artifice to defraud that among the materials CURRAN sold was what he referred to as the "Green Drink." The Green Drink was marketed as

a nutritional supplement containing "a synergistic blend of all natural compounds that support and promote the body's overall ability to fight and prevent diseases."

41. It was further part of the scheme and artifice to defraud that CURRAN induced patients to engage in treatment protocols, including using the following : (1) hydrotherapy massage machine; (2) spectra color spa system; (3) hyperbaric chamber; (4) hydro massager with infra red light; (5) ionic cleaner; (6) massage capsule; and (7) personal sauna with white plastic hoses.

42. From on or about January 1, 2003 to on or about December 31, 2004, CURRAN fraudulently provided services to approximately 354 customers. Each customer was falsely subjected to the live blood analysis and the bio-meridian stress analysis and each was sold treatments and services in the approximate amount of $1,410,095, as recorded by the Northeast Institute.

43. As a result of the scheme and artifice to defraud, CURRAN obtained money from consumers who provided funds through cash, checks, or credit cards, or the CareCredit line of credit provided by GE Capital.

**B. <u>Execution of the Scheme</u>**

44. On or about October 28, 2004, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, CURRAN knowingly caused to be transmitted in interstate commerce, signs, signals, and sounds, according to the directions thereon, a facsimile transmission from CURRAN to Practice Builders, Inc, regarding the development of a promotional brochure.

All in violation of 18 U.S.C. § 1343.

**COUNT 2**
**(Wire Fraud)**

45. The Grand Jury realleges and incorporates by this reference paragraphs 1 through 43 of Count 1 of this Indictment in their entirety as though fully set forth herein.

46. On or about May 5, 2004, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, Defendant, JOHN E. CURRAN, knowingly caused to be transmitted in interstate commerce, signs, signals, and sounds, according to the directions thereon, an electronic mail message from Dr. Larry McDade addressed to "drcurran2@aol.com" containing payment and mailing instructions for a "Ph.D" degree from the Chatworth College.

All in violation of 18 U.S.C. § 1343.

**COUNT 3**
**(Wire Fraud)**

47. The Grand Jury realleges and incorporates by this reference paragraphs 1 through 43 of Count 1 of this Indictment in their entirety as though fully set forth herein.

48. On or about September 3, 2004, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, Defendant, JOHN E. CURRAN, knowingly caused to be transmitted in interstate commerce, signs, signals, and sounds, according to the directions thereon, a sales agreement to purchase BioMeridian equipment, executed by CURRAN that specifically and falsely acknowledged that he was "either a certified and licensed health care practitioner in all jurisdictions in which [he] coduct[ed]

business" and that he was "aware" that the bio meridian equipment "is not used to diagnose, treat, or cure health conditions or disease."

All in violation of 18 U.S.C. § 1343.

**COUNT 4**
**(Wire Fraud)**

49. The Grand Jury realleges and incorporates by this reference paragraphs 1 through 43 of Count 1 of this Indictment in their entirety as though fully set forth herein.

50. On or about August 31, 2004, Defendant, JOHN E. CURRAN, saw a customer identified as "AD." CURRAN falsely diagnosed AD as having her blood cells "infested with parasites" and containing an "indication of early cancer," and that she should "picture herself at the edge of cliff" to the extent that her condition was so critical that if it was not treated immediately with drastic measures, within one to two years AD "would fall off the cliff."

51. On or about August 31, 2004, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, CURRAN knowingly caused to be transmitted in interstate commerce, signs, signals, and sounds, according to the directions thereon, a CareCredit facsimile application for a line of credit line in the name of AD's mother, LD, for expenses to be incurred on behalf AD.

All in violation of 18 U.S.C. § 1343.

**COUNTS 6 - 19**
**(Wire Fraud)**

52. The Grand Jury realleges and incorporates by this reference paragraphs 1 through 43 of Count 1 of this Indictment in their entirety as though fully set forth herein.

53. On or about the dates set forth below, in the District of Rhode Island and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, Defendant, JOHN E. CURRAN, knowingly caused to be transmitted in interstate commerce, signs, signals, and sounds, according to the directions thereon, to wit, credit card and CareCredit charges for services and products sold:

| Count | Customer | Date | Charge Account | Amount |
|---|---|---|---|---|
| 6 | JD | 5/13/04 | Visa | $347.59 |
| 7 | BBR | 5/6/04 | Visa | $3,088.73 |
| 8 | BBR | 6/3/04 | MasterCard | $1,457.07 |
| 9 | SB | 7/22/04 | CareCredit | $3,505.05 |
| 10 | SB | 7/29/04 | CareCredit | $2,995.00 |
| 11 | LM | 8/13/04 | Visa | $2,000.00 |
| 12 | LM | 9/30/04 | Visa | $1,523.86 |
| 13 | LM | 11/5/04 | Visa | $1,283.11 |
| 14 | FL | 10/16/04 | MasterCard | $1,272.07 |
| 15 | FL | 10/26/04 | MasterCard | $278.14 |
| 16 | FL | 11/2/04 | MasterCard | $1,106.86 |
| 17 | TH | 10/27/04 | CareCredit | $5,447.92 |
| 18 | CR | 11/30/04 | CareCredit | $3,724.08 |
| 19 | NH | 12/17/04 | MasterCard | $3,119.78 |

All in violation of 18 U.S.C. § 1343.

**COUNTS 21 - 23**
**(Money Laundering)**

54. On about the dates set forth below, in the District of Rhode Island, and elsewhere, Defendant, JOHN E. CURRAN, knowingly conducted and attempted to conduct financial transactions affecting interstate commerce, to wit, payments for equipment to diagnose and treat alleged diseases and for fraudulent credentials, the payment for which involved the proceeds of a specified unlawful activity, that is Wire Fraud, in violation of 18 U.S.C. § 1343, with the intent to promote the carrying on of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, CURRAN knew that the property involved in the financial transactions, that is the checks drawn on Citizen's Bank Account No. 1452-751-0 described below, represented the proceeds of some form of unlawful activity:

| Count | Date | Check No. | Amount | Payee |
|---|---|---|---|---|
| 21 | 7/3/03 | 2039 | $10,690 | American Express (for "Spectracolor Spa System) |
| 22 | 8/8/03 | 2124 | $20,205 | American Express (for payment of "One Vitaris Hyperbaric Chamber) |
| 23 | 5/17/04 | 5693 | $2,650 | Larry McDade (Ph.D. degree) |

All in violation of 18 U.S.C. §§ 1956(a)(1)(A) (i) and 2.

## MONEY LAUNDERING FORFEITURE ALLEGATIONS

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction, the Defendant, JOHN E. CURRAN, shall forfeit to the United States of America all right, title and interest in any and all property, which was involved in the transactions alleged in Counts 21 through 23 above, which allege violations of 18 U.S.C. § 1956(a)(1)(A)(i) and 2, and all property traceable to such property including, but not limited to the following:

a. One Thermal Imaging Unit manufactured by Teletherm Inc.;

b. One SpectraColor Spa System manufactured by Sybartic, Inc.;

c. One Vitaeris 320 Hyperbaric Chamber manufactured by Vita 02 Inc, Dawsonville, Georgia;

d. Account No. 1452-751-0 in the name of The Northeastern Institute for Advanced Natural Healing located at Citizen's Bank of Rhode Island, One Citizens Plaza, Providence, Rhode Island containing $15,821.57; and,

e. Two Thousand Five Hundred and Ten Dollars ($2,510).

All in accordance with 18 U.S.C. § 982(a)(1).

## WIRE FRAUD FORFEITURE ALLEGATIONS

Pursuant to 18 U.S.C. § 981(a)(1)(C) as incorporated by 28 U.S.C. § 2461, upon conviction, the Defendant, JOHN E. CURRAN, shall forfeit to the United States of America all right, title and interest in any and all property, which constitutes or is derived from proceeds traceable to the offenses of wire fraud, 18 U.S.C. § 1343 as alleged in Counts 1 through 4, and Counts 6 through 19 above, including, but not limited to the following:

a. One Thermal Imaging Unit manufactured by Teletherm Inc.;

b. One SpectraColor Spa System manufactured by Sybartic, Inc.;

c. One Vitaeris 320 Hyperbaric Chamber manufactured by Vita 02 Inc, Dawsonville, Georgia;

d. Account No. 1452-751-0 in the name of The Northeastern Institute for Advanced Natural Healing located at Citizen's Bank of Rhode Island, One Citizens Plaza, Providence, Rhode Island containing $15,821.57; and,

e. Two Thousand Five Hundred and Ten Dollars ($2,510).

All in accordance with 18 U.S.C. § 981(a)(1)(C).

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

for Kenneth P. Madden, FAUSA
GERARD B. SULLIVAN
CRIMINAL CHIEF

Luis M. Matos
LUIS M. MATOS
ASSISTANT U.S. ATTORNEY

Lisa Dinerman
LISA DINERMAN
ASSISTANT U.S. ATTORNEY

DATED: 9/16/05