**IN THE DISTRICT COURT FOR THE UNITED STATES**

**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-102ML |
| | ) | |
| JOHN CURRAN | ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States files this sentencing memorandum in order to comprehensively address the sentencing issues presented by this case. Sentencing is this matter is scheduled for August 25, 2006. The pre-sentence report ("PSR") has determined a total offense level of 39 and a criminal history category of I, rendering a guideline range of 262 to 327 months. Defendant has filed certain objections. He objects to enhancements for: (1) amount of loss in the amount of $1,383,429.77; (2) more than 250 victims; (3) large number of vulnerable victims; (4) conscious disregard for risk of death or serious bodily injury; and (5) obstruction of justice.[1] The United States addresses each objection below.

## A. Number of Victims and Amount of Loss

Defendant complains that it is improper to conclude that more that 350 victims were defrauded from 2003 through 2004 in the amount of $1,383,429.77. However, that is exactly what the evidence proves.

As an initial matter, even after United States v. Booker, 543 U.S. 220 (2005), the standard of proof in sentencing cases remains preponderance of the evidence. United States. v. Thurston,

[1] Defendant does not object to the enhancement for abuse of position of trust, hence it is not addressed herein. In addition, pursuant a status conference call with the Court on August 18, 2006, the restitution issues are not addressed herein.

___ F.3d __, 2006 WL 2065404 (1st Cir. 2005) (The First Circuit has rejected the argument that Booker raises the standard of proof for imposing guidelines enhancements from a preponderance of the evidence to beyond a reasonable doubt), citing, United States v. Yeje-Cabrera, 430 F.3d 1, 17, n.4 (1st Cir.2005); United States v. Antonakopoulos, 399 F.3d 68, 80 (1st Cir.2005). Hence, to the extent that defendant argues that certain enhancements have not been proven "beyond reasonable doubt," he misstates the standard. Moreover, it is well established that the amount of loss is not limited to the victims who testified at trial but to all relevant conduct. U.S.S.G. § 1B1.3.

In this case, the defendant has been convicted of a wide ranging scheme to defraud his victims by ignoring applicable State and Federal health regulations and by falsely representing the nature of his practice, his educational background and his treatment experience in order to deceive them into buying supplements and other items from his "pharmacy" as well as additional treatment "protocols." At trial, the evidence was that in 1998, defendant was ordered by the R.I. Department of Health (DOH) to forego doing live blood analysis (occasionally referred to as "LBA") and that he falsely led the DOH to believe that he would not conduct live blood analysis. Government Trial (GX) GX 17. He also obtained false medical degrees from St. Lukes School and the Asian American School in 2002. And, as the testimony of Ms. Rhonda Alves attests, he falsely advertised that he could cure clients of life-threatening diseases though the entire period of his scheme. In 1998, he advised Ms. Alves' daughter, Taylor Alves, who was dying of cancer, that although she had exhausted her treatment options at prestigious traditional cancer treatment locations, "now you have come to me" – implying that he could cure her.

Hence, every patient who saw him in 2003 and 2004 was subjected to his fraudulent scheme, whether they acknowledge it or not, because during those years he was falsely holding himself out as a doctor, conducting live blood analysis and claiming that he could cure his victims of debilitating disease. United States v. Brien, 617 F.2d 299, 311 (1st Cir. 1980) (If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts. The only issue is whether there is a plan, scheme or artifice to defraud."); United States v. Berneano, 161 F.3d 3, 1998 WL 553445 (4th Cir. Aug. 28, 1998) ("The perception of the victim or target of the scheme is ultimately irrelevant to whether [defendant] devised a scheme or acted with the requisite intent to defraud.") (attached); United States v. Biesiadecki, 933 F.2d 539, 543-44 (7th Cir. 1991) (district court properly excluded testimony from customers not named in indictment who did not feel deceived by defendant's sales presentation because such testimony was irrelevant to whether defendant's conduct was fraudulent).

Moreover, the evidence at trial showed that every client listed on GX 303 was falsely subjected to the live blood analysis and the majority were subjected to the bio-meridian stress analysis and each was sold treatments and services. Hence, they were all, at minimum, subjected to the false pretense that defendant was legally allowed to conduct the live blood analysis. Hence, they are all victims and they suffered a loss of approximately $1,383,429.77 during those two years alone. GX 305, 306 and 351.

### B. An Adjustment for Multiple Vulnerable Victims is Appropriate

Defendant objects to a four level adjustment for multiple vulnerable victims. He acknowledges that some of the victims were suffering from life threatening diseases, such as Taylor Alves and Francisco LoBuono, but denies any evidence "beyond reasonable doubt" of a large number of vulnerable victims. He does not object to the conclusion that a 2 level enhancement for vulnerable victims is appropriate, but takes issue with an additional 2 levels for a large number of vulnerable victims. Defendant's Objections at 8. Again the standard here is preponderance of the evidence.

U.S.S.G. § 3A1.1(b) reads:

> (1) If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels.
>
> (2) If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels.

Application note 2 to U.S.S.G. § 3A1.1(b) states in pertinent part:

> For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is <u>unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct</u>.
>
> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim unusual vulnerability. . . .

U.S.S.G. § 3A1.1, comment (n.2)(emphasis added).

Defendant ignores the evidence that his practice was premised on preying on vulnerable victims. In a marketing interview, he advised Practice Builders that "[h]is market is the people when all else has failed." GX 32, Bates No. 5. He also boasted that he provided a "cancer alternative" for those patients that "had cancer or strong family history of cancer." GX 32, Bates No. 6. His advertising "tag line" was "High tech holistic for your most serious medical problems." GX 32, Bates No. 11

He advertised that it was time to visit his office when "you have an unusual or rare disease that has your medical doctors and specialists baffled." GX 50, Bates No. 464. He bolstered the advertisements by falsely boasting that he had cured someone of Stage IV cancer. GX 50, Bates No. 468. In addition, as Theresa Hills testified, he would ask his clients "if you could have anything would it be your health no matter what." A comment reiterated to Practice Builders as his mantra that "you can't put a price on your health. GX 32, Bates No. 5. Dennis Hardy testified that he witnessed the defendant tell one client that he was the only person that could get her well. He told another that if she did not buy his products right away, she would die.

In addition, the evidence at trial about vulnerable victims was not limited to Taylor Alves and Francisco LoBuono. Bonnie Rae Brown testified about her myriad diseases. Ms. Brown testified that her mother in law flew from Florida to take her to see the defendant and that she undertook the protocol because she was desperate to travel to her stepson's wedding.

In addition, although they are trickling in, the victim declarations that have been submitted to the Court further support the adjustment. The following is a sampling of some of

the submissions that have been received. The relevant excerpts are attached.[2]

A gentleman named DB has filed a claim on behalf of his wife who passed away on June 12, 2004. (Attachment 1). AC has filed a statement on behalf of his late wife, NB, who passed away of breast cancer on July 12, 2003. He states that they went to see the defendant to "find something that would help stop the progress of her cancer . . . To put plainly we were desperate." (Attachments 2 and 3).

SG1 was 7 years old she had been diagnosed with polio and had been diagnosed with post-polio syndrome prior to vising the defendant. (Attachment 4). The defendant promised her that with "his care, [she] would eventually no longer need [her] crutches." (Attachment 5). KG was suffering from longstanding chronic conditions. The defendant "instilled fear in [her] that [her] condition would worsen if [she] did not do everything he said to do, so [she] did just that, trusting that the benefit would outweigh the cost." (Attachments 6, 7, and 8). SG2 stated that she went to see the defendant because of her Chron's disease. She went on his program after his "pressure tactics and guilt trip about [her] health." (Attachment 9). NI "left his office petrified, knowing [she] had lupus and thing that maybe he was right" when he told her that her major organs were not working. (Attachments 10, 11, and 12). KN went to see him because she had been feeling tired and exhausted for 10 years and "was vulnerable." (Attachments 13 and 14). Defendant told SJ that "he would help [her] get better, because [she had] lupus." (Attachments 17 and 18). JB writes that she "was vulnerable and [she] wanted someone [she] thought [she] could trust to help [her]." (Attachments 19 and 20 ).

---

[2] In the interest of confidentiality, the Government relies on the initials of the names of those individuals whose statements are attached in redacted form.

Hence, not only was his "business plan" premised upon attracting a large volume of vulnerable victims, there is preponderant evidence that he did just that. Hence, a four level adjustment is appropriate.

**C. Defendant Consciously Exposed His Victims to Risk of Death Or Serious Bodily Injury.**

Defendant objects to the enhancement for his conscious exposure of his clients to risk of death or serious bodily injury. U.S.S.G. § 2.B.1.1(B)(12)(A). Defendant's argument rests upon his contention that his victims arrived at his door with pre-diagnosed terminal disease and upon his minimization of the injuries to Ms. Brown and Ms. Barden. Defendant's argument misses the mark.

Every time a victim visited defendant suffering from a serious or debilitating disease and the defendant purported to be a doctor who could cure their every ill, he exposed them to harm. He exposed them harm by claiming that he could cure them and presented the very real risk that they would forego treatment from a qualified physician and instead opt to starve themselves on his green drink.

For instance, one of his victims is NP (Attachment 15), who recently submitted a declaration of loss. In her declaration of loss, NP states that she went see the defendant with unexplained fatigue and difficulty sleeping. According to NP, she has an increased risk of cancer recurrence because of the defendant's actions. NP has stated that she delayed performing a mammogram because defendant advised her that his thermal imaging machine was more effective than a mammogram. He performed a thermal imaging test in July of 2004 and although it detected that her left breast was warmer, he advised that it was within normal limits. In

December of 2004, against defendant's advice, she finally went for a mammogram. Abnormalities were detected and a biopsy confirmed cancer in her left breast resulting in a full mastectomy in March 2005. According to NP, the "5 month delay between John Curran's ineffective and badly interpreted screening and the mammography reduces [her] chances of reaching cancer free status." (Attachment 16).

In addition, defendant put all the victims to whom he professed to be a doctor at risk because he knew he was not a doctor, he should have known how incompetent he was to profess to cure people, and the natural consequences of such conduct are that people are placed at risk. Indeed his star testimonial, Mr. Steve Gillikin experienced a recurrence of cancer eight months after going on defendant's "treatment" protocol.

**D. Defendant Obstructed Justice**

The PSR contains a two level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 which states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant''s offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Among the examples of conduct that may qualify under an obstruction of justice enhancement is:

> (b) committing, suborning, or attempting to suborn perjury; . . . ,

U.S.S.G. § 3C1.1, comment (n.4).

A determination of whether defendant provided material false testimony is an "inescapably

factbound" inquiry for the Court. United States v. Cash, 266 F.3d 42, 44 (1st Cir.2001); United States v. David, 940 F.2d 722, 739 (1st Cir.1991); See also United States v. Villarman-Oviedo, 325 F.3d 1, 16 (1st Cir. 2003); United States v. Rowe, 202 F.3d 37, 43 (1st Cir.2000). The inquiry, however, may be guided by the commentary to the guidelines which clearly states that:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 3C1.1, comment (n. 2).

In addition, the First Circuit has advised that:

> Before imposing an obstruction of justice enhancement predicated on perjurious testimony, a sentencing court must survey the trial evidence to ascertain whether it establishes that the defendant gave 'false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory.' United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). The court's findings need not be precise to the point of pedantry. While separate findings as to each element are preferable, the sentencing court's determination is sustainable so long as it "encompasses all of the factual predicates." Id. at 95, 113 S.Ct. at 1117.

United States v. McKeeve, 131 F.3d 1 (1st Cir. 1997)(Holding that the overwhelming weight of the credible evidence contradicted the appellant's professions of ignorance.)

At trial, the defendant testified in a patently unbelievable manner. His testimony regarding his belief that, based upon his conversations with Steven Arnett, he had rightfully

earned a medical degree, or even an honorary medical degree, when compared to the evidence about how he "earned" his "Doc in a Box" degree is absurd. Defendant obtained a box of books, after sending an application to the Southern Graduate Institute, in November of 2001. GX 177. He allegedly read the books and sent in his "exam," along with $2,000 to Mr. Arnet on January 8, 2002. GX 118. He obtained a transcript from the Asian American Institute, dated February 1, 2002, that purported to show that, over the course of two months, he had completed seven semesters and four summers of study, for a total 252 credits, and that he had written a dissertation. See GX 126. Based upon that extensive study, he testified that he faithfully relied upon Mr. Arnett's direction that he could call himself a doctor, that he could apply to the American Medical Association, and that he could advertise an "honorary degree" from St. Lukes. Such testimony is willfully false.

In addition his testimony about his understanding of what type of live blood analysis he could conduct was clearly fabricated for trial. The evidence showed that on August 4, 1998, Curran advised the DOH he would no longer perform live blood analysis by stating: "I intend to comply with all the laws and regulations regarding live blood analysis, and will not conduct live blood analysis per request of the CLIA guidelines." GX 17. However, defendant admitted that he continued to perform live blood analysis after August 4, 1998, but claimed that he did it for much shorter durations. He attempted to draw a distinction between performing live blood "analysis" prior to Agust of 1998 and only performing live blood "demonstrations" after August 1998. That testimony alone is absurd an perjurious because the evidence is clear that he conducted live blood analysis throughout the tenure of his criminal conduct.

More egregiously, he testified that he did so because after he wrote to the DOH, he called an individual named Michael Coyle at Nu Life Sciences, which was based in Denver, Colorado, and that, based on his conversations with Mr. Coyle, he believed that he could continue to perform the blood work as long as he changed the manner in which he performed the tests. March 26, 2006, Trial Transcript at 15, 16. However, he never went back to the DOH to confirm whether he could continue to perform LBA. March 26, 2006, Trial Transcript at 183. Not only is his testimony patently absurd – that despite his interaction with DOH, he thought he could continue to perform LBA based upon his conversations with Coyle and without approval of DOH, it is also false because he called Mr. Coyle prior to August 4, 1998.

GX 21 is a contact report in which the DOH records that, on May 14, 1998, defendant advised the DOH on that he "had called the Colorado school that he had gone to for training for this test and his instructor told him his test was not subject to the CLIA requirements." GX 21. Hence, Curran committed perjury by falsely testifying about material evidence – when he called Mr. Coyle. He called him prior to May 14, 1998, not after he wrote to the DOH in August of 1998. Hence, he could not have reasonably relied upon Coyle after he contacted DOH in August because he had spoken to him in May, and, after that date, the DOH continued to insist that he comply with CLIA. He testimony regarding Coyle was clearly a post hoc fabrication meant to justify his conduct.

In addition, Curran perjured himself in regard to his testimony about the dissertation that he claimed he wrote in order to obtain his false PhD Degree from Chatworth College. He claimed that he mailed the dissertation immediately after speaking with Larry McDade, which was sometime prior to May 12, 2004. March 26, 2006, Trial Transcript at 158. However, the

trial evidence showed that the dissertation was not sent to McDade until after Curran was indicted in this matter, on September 16, 2005. GX 149. In addition, while Curran acknowledged that the dissertation had been written by a ghostwriter named Howard Edgar, he claimed that the book contained Curran's thoughts. March 26, 2006, Trial Transcript at 160, GX 149 (Edgar testified that he wrote most of the book based on his own research and that it was not finished). In truth, the trial transcript reveals that the book did not contain Curran's thoughts because he was not familiar with some of its statements.

For instance, Curran preached to his clients that they should avoid coffee. March 26, 2006, Trial Transcript at 91. However, the book alternatively stated that one should not drink coffee but, conversely, praised the health benefits of coffee. March 26, 2006, Trial Transcript at 164. (Curran tried to back peddle on the issue by claiming that the book actually contained "two thoughts," his own and Edgar's). Id, 164, 165. The book also contained an assertion that Paul Bragg, the founder of natural medicine, was a "friend and mentor" of the defendant's, when in reality, Mr. Bragg died in 1976, when Curran was 11 years old. March 26, 2006, Trial Transcript at 166. Finally, the book attested to the fact that a test referred to as an "antimalignant antibody screen" was the most accurate test for cancer anywhere. March 26, 2006, Trial Transcript at 166. Curran admitted that he had never heard of the test. March 26, 2006, Trial Transcript at 165. Hence, when he testified that the book was his, that it contained his thoughts, and that he mailed it after speaking with McDade, he testified falsely. Not only did he fail to write the " the book" he clearly also failed to read "the book."

Clearly, defendant deliberately misled the Court and the jury. Hence, the adjustment for obstruction of justice is appropriate.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court adopt the offense conduct calculation (level 39) contained in the PSR.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,
ROBERT CLARK CORRENTE
United States Attorney

LUIS M. MATOS
Assistant U.S. Attorney
Chief, Criminal Division

CERTIFICATE OF SERVICE

On this 21st day of August, 2006, I caused the Government's Sentencing Memorandum, with Attachments, to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Scott Lutes, Esq.
127 Dorrance Street
Providence, Rhode Island 02903

Notification by first class mail, postage prepaid to:

Dennis Jenkins
United States Probation Officer
United States Probation Office
John O. Pastore Federal Building & US Post Office
Two Exchange Terrace
Providence, Rhode Island 02903
12345 Plainfield Avenue
Woonsocket, Rhode Island 02895

/s/ Luis M. Matos
Assistant US Attorney